1  COOLEY GODWARD KRONISH LLP
2  MICHAEL A. ATTANASIO (151529)
   (mattanasio@cooley.com)
3  SAMANTHA M. EVERETT (234402) (severett@cooley.com)
   4401 Eastgate Mall
   San Diego, CA 92121
4  Telephone:    (858) 550-6000
   Facsimile:    (858) 550-6420
5
   Attorneys for Defendant
6  SAZERAC COMPANY, INC.
7

**Filed**

MAR 2 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

**E-FILING**

**ADR**

8             UNITED STATES DISTRICT COURT
9            NORTHERN DISTRICT OF CALIFORNIA
10                  SAN JOSE DIVISION
11

12  DEBORAH DI GRAZIA,                    C08 No. 01562 PVT
13             Plaintiff,                 NOTICE OF REMOVAL
14       v.
15  SAZERAC COMPANY, INC.,
16             Defendant.
17

18      TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
19  DISTRICT OF CALIFORNIA, AND TO THE CLERK OF THAT COURT:
20      PLEASE TAKE NOTICE that defendant Sazerac Corporation, Inc. ("Sazerac"), by and
21  through its undersigned counsel, hereby removes the state court action described below from the
22  Superior Court of the State of California, County of Monterey, to the United States District Court
23  for the Northern District of California pursuant to 28 U.S.C. §§ 1332, 1441 and 1446. Sazerac
24  respectfully submits that removal is proper for the following reasons:
25      1.    On or about February 20, 2008, plaintiffs commenced a civil action in the Superior
26  Court of the State of California, County of Monterey, captioned *Deborah Di Grazia v. Sazerac*
27  *Company, Inc.*, Case No. M89270 (the "Action").
28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
NEW YORK                              1.                        NOTICE OF REMOVAL

1    **2.**    Defendant Sazerac was served with copies of the Civil Lawsuit Notice, Civil Case

2    Cover Sheet, Summons, and Complaint with exhibits, on February 21, 2008.   True and correct

3    copies of the Civil Lawsuit Notice, Civil Case Cover Sheet, Summons, and Complaint with

4    exhibits are attached hereto as Exhibit 1.

5    **3.**    No other process, pleadings or orders have been filed or served on Sazerac in the

6    Action as of the date of filing of this Notice of Removal.

7    **4.**    This Notice of Removal is filed within thirty days of receipt by Sazerac of the

8    Complaint and, thus, is timely under 28 U.S.C. § 1446(b).  *See* Ex. A; *see also Murphy Bros., Inc.*

9    *v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999) (holding that defendant's time to remove is

10   triggered by service of the summons and complaint on defendant); Fed. R. Civ. P. 6; Cal. Civ.

11   Proc. Code §§ 12, 12a, 135.

12   **5.**    As of the date of filing of this Notice of Removal, Sazerac is informed and

13   believes that no other defendants have been served in the Action.   There are no other named

14   parties to the Action.

15                                        **JURISDICTION**

16   **6.**    Plaintiff Deborah Di Grazia is a resident of Monterey County, California.

17   **7.**    Defendant Sazerac is incorporated in the state of Louisiana and has its principal

18   place of business in New Orleans, Louisiana.

19   **8.**    There are no other named parties to the Action.

20   **9.**    The amount in controversy in the Action exceeds $75,000

21   **10.**    This Court has jurisdiction over the Action pursuant to 28 U.S.C. § 1332.

22   **11.**    Pursuant to 28 U.S.C. § 1446(d), Sazerac will promptly file a Notice of Filing of

23   Notice of Removal with the Monterey County Superior Court to effectuate removal.  Sazerac will

24   also promptly serve plaintiff's attorneys of record with this Notice of Removal and the Notice of

25   Filing of Notice of Removal.

26   **12.**    Nothing herein constitutes a waiver of any of Sazerac's rights, objections or

27   defenses, including without limitation its right to seek dismissal of the Complaint on any grounds.

28

1    WHEREFORE, Sazerac respectfully requests that the entire Action proceed before this

2    Court as an action properly removed. This Notice of Removal is signed pursuant to Federal Rule

3    of Civil Procedure 11.

4

5    Dated: March 21, 2008                    Respectfully submitted,

6                                             COOLEY GODWARD KRONISH LLP

7

8

9                                            Samantha M. Everett

10                                           Attorneys for Defendant
                                             SAZERAC COMPANY, INC.
11

12       580291 v1/SD

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

1    MANATT, PHELPS & PHILLIPS, LLP
     ANDREW A. BASSAK (State Bar No. 162440)
2    ANN M. HEIMBERGER (State Bar No. 197060)
     ROSS K. NAUGHTON (State Bar No. 254926)
3    One Embarcadero Center, 30th Floor
     San Francisco, CA 94111
4    Telephone: (415) 291-7400
     Facsimile: (415) 291-7474
5
     Attorneys for Plaintiff
6    DEBORAH DI GRAZIA

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                               COUNTY OF MONTEREY

10

11   DEBORAH DI GRAZIA, a widow,              Case No.

12              Plaintiff,                     **COMPLAINT**

13        vs.                                  1. **Breach of Contract**

14   SAZERAC COMPANY, INC., a Louisiana        2. **Breach of Implied Covenant of Good Faith**
     corporation; and DOES 1-20,
15                                             3. **Unjust Enrichment**
                Defendants.
16                                             4. **Breach of Implied Covenant**

17                                             5. **Breach of Contract – Third Party**
                                                 **Beneficiary**
18

19

20            Plaintiff DEBORAH DI GRAZIA hereby claims against defendants and alleges as

21   follows:

22                                    **INTRODUCTION**

23            1.      This is a contract dispute involving payments due to the plaintiff, Deborah

24   di Grazia (hereinafter, "Plaintiff" or "Mrs. di Grazia"), from defendant, Sazerac Company, Inc.

25   (hereinafter, "Sazerac" or "Defendant"), pursuant to a written agreement between Mrs. di

26   Grazia's deceased husband, her predecessor in interest, and Sazerac.

27            2.      For over twenty-five years, Loris di Grazia ("Mr. di Grazia"), Plaintiff's

28   husband, was the exclusive United States representative of Tequila Herradura, S.A.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO        196601597.2

                                    COMPLAINT

1   ("Herradura"), for the import and distribution of tequila. Over the years, and from time to time,

2   Mr. di Grazia would enter into agreements with various entities pursuant to which he would

3   resign his exclusive representation of Herradura and permit various entities to become

4   Herradura's distributor of tequila in the United States. In exchange, Mr. di Grazia would receive

5   payments based on the purchases of tequila made by those entities. In each instance, when those

6   agreements terminated, Mr. di Grazia's exclusive representation rights would revert to him.

7           3.      The most recent entity to benefit from such an agreement was Sazerac.

8           4.      For many years, Sazerac made payments to Mr. di Grazia in accordance

9   with such a written agreement. For some months after Mr. di Grazia's death in 2006, pursuant to

10  the agreement, Sazerac continued to make payments to Mrs. di Grazia, his widow and the

11  permissible assignee of Mr. di Grazia's rights.

12          5.      Without notice, in late 2006, Sazerac stopped making payments to Mrs. di

13  Grazia. Mrs. di Grazia contacted Sazerac requesting resumption of the payments, but Sazerac has

14  thus far refused to make any additional payments, claiming obligations to her under the

15  agreement have ceased.

16          6.      In this action, Mrs. di Grazia seeks money owed to her by Sazerac.

17                                          **THE PARTIES**

18          7.      Plaintiff DEBORAH DI GRAZIA is, and at all times mentioned herein

19  was, a resident of California.

20          8.      Plaintiff is informed and believes and on that basis alleges that Defendant

21  SAZERAC COMPANY, INC. is, and at all times mentioned herein has been, a corporation duly

22  organized and existing under the laws of the state of Louisiana. Sazerac's principal place of

23  business is located at 803 Jefferson Highway, New Orleans, Louisiana. Sazerac is an importer,

24  seller, marketer and distributor of spirits in the United States.

25          9.      Plaintiff is informed and believes, and on that basis alleges, that DOES 1

26  through 20 are entities and individuals who are responsible in part for the damages alleged in this

27  complaint. In doing the things alleged in this complaint, such DOE defendants acted as agents,

28  servants or employees of, or participants with, defendant, and with defendant's consent or

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

196601597.2                                    2

                                          COMPLAINT

1    permission. Plaintiff presently is unaware of the identity of these DOE defendants and will

2    amend this Complaint when she determines their identities.

3                                    JURISDICTION AND VENUE

4            10.    This Court has subject matter jurisdiction over this case because the

5    amount in controversy exceeds the jurisdictional minimum.

6            11.    This Court has personal jurisdiction over Defendant under California Code

7    of Civil Procedure § 410.10 because Defendant is registered to do business in California,

8    Defendant maintains an agent for service of process in California, and the contract at issue was to

9    be performed in California; and under California Code of Civil Procedure § 410.40, because the

10   written agreement between Plaintiff and Defendant contained the following provision at

11   paragraph 5:

12           Venue; Governing Law: The proper and exclusive forum for
             litigation of any disputes or controversies arising out of or relating
13           to this Agreement shall be the federal or state courts in the State of
             California. This Agreement shall be construed and interpreted in
14           accordance with the laws of the State of California, without regard
             to choice of law rules.
15

16           12.    Venue is proper in this Court under C.C.P. § 395 and C.C.P. § 395.5,

17   because Mr. and Mrs. di Grazia resided in the County of Monterey at all times relevant to this

18   action, and the contract at issue was to be performed in the County of Monterey.

19                                    GENERAL ALLEGATIONS

20           13.    Herradura Tequila, S.A. ("Herradura"), a Mexican corporation, is a

21   producer, bottler and exporter of tequila known under the names Herradura Gold, Herradura

22   Silver, Herradura Anejo and other brands (collectively referred to as "Herradura Brands").

23           14.    On or about April 28, 1981, Herradura appointed Mr. di Grazia as its

24   exclusive representative for importing and selling Herradura Brands in the United States. Since

25   that time and until his death, Mr. di Grazia maintained a strong business relationship and

26   friendship with the president of Herradura, Guillermo Romo.

27           15.    On October 21, 1991, Mr. di Grazia entered into an agreement with

28   Sazerac (the "Agreement"). A true and correct copy of the Agreement is attached to this

MANATT, PHELPS &          196601597.2                    3
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO                                      COMPLAINT

1    Complaint as <u>Exhibit A</u> and is incorporated herein by this reference. Pursuant to the Agreement,

2    Mr. di Grazia relinquished his rights as the exclusive representative of Herradura in the United

3    States. The Agreement was conditioned on Sazerac entering into a separate agreement with

4    Herradura to distribute Herradura Brands. In exchange, Sazerac agreed to pay Mr. di Grazia an

5    initial payment, plus subsequent payments based on purchases of Herradura Brands made by

6    Sazerac under the anticipated agreement between Sazerac and Herradura.

7         16.    At the same time, on October 21, 1991, Sazerac did enter into an

8    agreement with Herradura (the "Herradura-Sazerac Agreement"). A true and correct copy of the

9    Herradura-Sazerac Agreement is attached to this Complaint as <u>Exhibit B</u>, and is incorporated

10   herein by this reference. Under the terms of the Herradura-Sazerac Agreement, Herradura

11   appointed Sazerac as the exclusive importer, seller, marketer and distributor of Herradura Brands

12   in the United States. In exchange, Sazerac agreed to make purchases of Herradura Brands.

13        17.    For approximately fifteen years, Sazerac made purchases of Herradura

14   Brands, and it made regular payments to Mr. di Grazia based on those purchases.

15        18.    Mr. di Grazia died in February 2006. Mrs. di Grazia succeeded to di

16   Grazia's rights under the terms of the Agreement and continued to receive payments from

17   Sazerac pursuant to the terms of the Agreement.

18        19.    At some point in 2006, Brown-Forman Corp. ("Brown-Forman") acquired

19   Herradura. Brown-Forman is a producer and distributor of spirits, and its principal place of

20   business is in Louisville, Kentucky. Plaintiff is informed and believes, and on that basis alleges,

21   that either Brown-Forman or Herradura and Sazerac entered into an agreement whereby Sazerac

22   voluntarily gave up its rights to distribute Herradura Brands in the United States. Plaintiff further

23   believes that in exchange for giving up those rights, Sazerac received a substantial payment from

24   either Brown-Forman or Herradura based on the profits Sazerac anticipated realizing from the

25   sale of Herradura Brands it expected to purchase through the remaining term of the Herradura-

26   Sazerac Agreement.

27        20.    On or about October 2006, Sazerac ceased making payments to Mrs. di

28   Grazia pursuant to the Agreement. Mrs. di Grazia contacted Sazerac regarding the payments.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

196601597.2                          4

COMPLAINT

1    Sazerac initially declined to explain why it had stopped making payments. Then, Sazerac

2    claimed it had stopped making payments because it had voluntarily given up its distribution rights

3    of Herradura Brands and was no longer making purchases of Herradura Brands. Therefore,

4    Sazerac considered itself no longer bound by the Agreement.

5

6                            **FIRST CAUSE OF ACTION**
                            **(Breach of Contract)**

7              21.    Plaintiff realleges and incorporates by reference the allegations of

8    paragraphs 1-20 as set forth above.

9              22.    Plaintiff and Mr. di Grazia have performed all conditions, covenants, and

10   promises required on their part to be performed in accordance with the terms and conditions of

11   the Agreement.

12             23.    Sazerac breached the Agreement by failing to pay Mrs. di Grazia when

13   Sazerac received payments from either Brown-Forman or Herradura in lieu of purchases Sazerac

14   would otherwise have made during the remaining term of the Herradura-Sazerac Agreement.

15             24.    Mrs. di Grazia requested Sazerac to make the payments due to her in

16   accordance with the Agreement, and Sazerac refused.

17             25.    As a result of Sazerac's breach of the Agreement, Plaintiff has been

18   damaged in an amount to be determined at trial.

19

20                         **SECOND CAUSE OF ACTION**
            **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

21             26.    Plaintiff realleges and incorporates by reference the allegations of

22   paragraphs 1-25 as set forth above.

23             27.    The Agreement contained an implied covenant of good faith and fair

24   dealing, obligating each party not to act in a manner that would render the performance of the

25   contract impossible, or impair the right of the other party to receive its anticipated benefits of the

26   Agreement.

27             28.    Sazerac breached the covenant of good faith and fair dealing by voluntarily

28   giving up its rights to distribute the Herradura Brands and receiving compensation therefore

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

196601597.2

5

COMPLAINT

1  without paying Mrs. di Grazia in accordance with the Agreement. By this act, Sazerac prevented

2  Mrs. di Grazia from receiving the benefits due and owing to her under the Agreement.

3          29.     As a result of Sazerac's breach of the covenant of good faith and fair

4  dealing, Plaintiff has been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)

7          30.     Plaintiff realleges and incorporates by reference the allegations of

8  paragraphs 1-29 as set forth above.

9          31.     Plaintiff is informed and believes, and on that basis alleges, that in

10  exchange for voluntarily giving up its rights to distribute Herradura brands in the United States,

11  Sazerac received a substantial payment from either Brown-Forman or Herradura in lieu of

12  purchases Sazerac would otherwise have made during the remaining term of the Herradura-

13  Sazerac Agreement. By failing to pay the appropriate portion of this amount to Mrs. di Grazia as

14  provided in the Agreement, Sazerac has been unjustly enriched at Mrs. di Grazia's expense.

15          32.     As a result of Sazerac's conduct, Plaintiff has been damaged and seeks

16  restitution in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Breach of an Implied Covenant to Continue Purchasing Herradura Brands)

19          33.     Plaintiff realleges and incorporates by reference the allegations of

20  paragraphs 1-32 as set forth above.

21          34.     The Agreement contained an implied covenant that Sazerac would continue

22  to make purchases of Herradura Brands during the full term of the Herradura-Sazerac Agreement.

23  The language of the Agreement clearly contemplates that Sazerac's continued purchases of

24  Herradura Brands were an indispensable aspect of the Agreement with Mr. di Grazia. The parties

25  deemed it unnecessary to expressly state the covenant because the Agreement, in order to fulfill

26  its purpose, clearly required Sazerac to continue making purchases of Herradura Brands for the

27  required period. Therefore, both parties intended that Sazerac would continue to make purchases

28  of Herradura Brands.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

196601597.2

6

COMPLAINT

1    35.    By failing to continue to make purchases of Herradura Brands for the full

2    term of the Herradura-Sazerac Agreement, Sazerac breached the implied covenant contained in

3    the Agreement to continue making purchases of Herradura Brands.

4    36.    As a result of Sazerac's breach, Plaintiff has been damaged in an amount to

5    be determined at trial.

6

## FIFTH CAUSE OF ACTION
### (Third Party Beneficiary)

7

8    37.    Plaintiff realleges and incorporates by reference the allegations of

9    paragraphs 1-36 as set forth above.

10    38.    Both Herradura and Sazerac were aware that Mr. di Grazia would benefit

11    by their entering into the Herradura-Sazerac Agreement. Appendix 1 to the Herradura-Sazerac

12    Agreement expressly states that Sazerac shall make payments to Mr. di Grazia in consideration of

13    the rights granted by Herradura.

14    39.    Because of the longstanding relationship between Guillermo Romo,

15    president of Herradura, and Mr. di Grazia, and because Guillermo Romo knew that Mr. di Grazia

16    had relinquished his right to distribute Herradura Brands in the United States, Herradura intended

17    that Mr. di Grazia would and his successors benefit in that they would receive payments from

18    Sazerac, pursuant to the Agreement, based on Sazerac's purchases of Herradura Brands under the

19    Herradura-Sazerac Agreement.

20    40.    Mr. di Grazia was, and Mrs. di Grazia as his successor in interest is, a third

21    party beneficiary of the Herradura-Sazerac Agreement.

22    41.    By the terms of the Herradura-Sazerac Agreement, it was agreed that

23    Sazerac would make purchases of the Herradura Brands. By voluntarily giving up its right to

24    distribute the Herradura Brands, Sazerac ceased to make purchases, thereby depriving Mrs. di

25    Grazia of the benefits that she would have derived if those purchases continued through the

26    balance of the term as agreed.

27    42.    As a result of Sazerac's actions, Plaintiff has been damaged in an amount

28    to be determined at trial.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

196601597.2

7

COMPLAINT

1    WHEREFORE, Plaintiff prays for relief as follows:

2        1.    For damages and restitution in an amount to be proven at trial,

3        2.    For reasonable attorneys' fees;

4        3.    For costs of suit; and

5        4.    For such other and further relief as the Court may deem just and proper.

6

7    Dated: February 14, 2008                    MANATT, PHELPS & PHILLIPS, LLP

8

9                                                By: _____

10                                                   Andrew A. Bassak
                                                     Attorneys for Plaintiff
11                                                   DEBORAH DI GRAZIA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

196601597.2                                    8

                                          COMPLAINT

# EXHIBIT A

<u>AGREEMENT</u>

This Agreement is entered into on the 21st day of October, 1991, between Sazerac Company, Inc., a Louisiana corporation ("SAZERAC"), and Loris M. DiGrazia ("DiGRAZIA").

WHEREAS, SAZERAC is an importer, seller, marketer and distributor of spirits products in the United States of America, which includes its territories and possessions, including Puerto Rico and the U.S. Virgin Islands, and the District of Columbia. (The United States of America, the above-described territories, and within such territories and the U.S., airlines, ship chandlers, duty free shops, embassies and military installations are hereinafter referred to as the "Territory"); and

WHEREAS, SAZERAC desires to become the exclusive importer, seller, marketer and distributor of the Tequila produced, bottled and exported by Tequila Herradura, S. A., a Mexico corporation ("HERRADURA"); and

WHEREAS, said Tequila is presently known under the names Herradura Gold, Herradura Silver and Herradura Anejo (the "Brands"); and

WHEREAS, The House of Seagram ("SEAGRAM") is currently the exclusive importer, seller, marketer and distributor of the Brands; and

WHEREAS, HERRADURA plans to terminate its presently existing arrangement with SEAGRAM; and

WHEREAS, DiGRAZIA will become (after termination of the SEAGRAM distribution arrangement) the exclusive representative in the United States and its territories and possessions for the importing and selling of the Brands pursuant to the terms of a letter agreement dated April 28, 1981 (the "Letter Agreement") between HERRADURA and DiGRAZIA; and

WHEREAS, SAZERAC and DiGRAZIA understand that HERRADURA is considering appointing SAZERAC as its exclusive importer, seller, marketer and distributor of the Brands in the Territory; and

WHEREAS, upon the effective date of such appointment, DiGRAZIA will relinquish his rights under the Letter Agreement, as provided in paragraph 2(b) of this Agreement; and

WHEREAS, SAZERAC will purchase the inventory of the Brands currently held by SEAGRAM directly from SEAGRAM (the "Seagram Inventory").

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, receipt of which is hereby acknowledged, SAZERAC and DiGRAZIA agree as follows:

1. <u>Best Efforts to Obtain Definitive Agreement between SAZERAC and HERRADURA</u>:

(a)  SAZERAC shall use its best efforts to negotiate, obtain required corporate approvals of, and execute and deliver a definitive agreement (the "Definitive Agreement"), upon mutually agreeable terms, between SAZERAC and HERRADURA. DiGRAZIA shall use his best efforts to facilitate these negotiations and to assist SAZERAC and HERRADURA to reach an agreement and to execute and deliver the Definitive Agreement. DiGRAZIA shall use his best efforts to obtain from HERRADURA the release (the "HERRADURA Release") described in paragraph 1(d), below, which release shall be incorporated into the Definitive Agreement.

(b)  The Definitive Agreement shall provide, <u>inter alia</u>, that:

(i) HERRADURA shall appoint SAZERAC as the exclusive importer, seller, marketer and distributor of the Brands in the Territory.

(ii) In consideration for the rights granted by HERRADURA to SAZERAC under the Definitive Agreement, SAZERAC shall make:

(A)  An initial payment upon the effective date of the Definitive Agreement; and

(B)  subsequent payments based upon purchases of the Brands by SAZERAC.

All such payments required by sub-paragraphs 1(b)(ii)(A) and (B), above, shall be made to DiGRAZIA in accordance with the terms of paragraph 2 below, which payments shall be in addition to SAZERAC's obligations to HERRADURA under the Definitive Agreement.

(c)  The Definitive Agreement shall contain customary representations, warranties, covenants and conditions to the extent the same are not inconsistent with this Agreement, other terms which are agreeable to SAZERAC and HERRADURA, and such other provisions as are necessary or appropriate for a transaction of the nature contemplated thereby.

(d)  The HERRADURA Release shall be a general release of all claims against SAZERAC and DiGRAZIA relating to the

payments set forth in this Agreement and shall contain acknowledgements by HERRADURA that:

   (i) In consideration for the rights granted by HERRADURA to SAZERAC under the Definitive Agreement, SAZERAC shall make the following payments to DiGRAZIA:

    (A)  An initial payment upon the effective date of the Definitive Agreement; and

    (B)  subsequent payments based upon purchases of the Brands by SAZERAC.

   (ii) HERRADURA has been advised that the amounts of said payments by SAZERAC to DiGRAZIA are substantial.

   (iii) HERRADURA agrees that said amounts need not be disclosed to HERRADURA by either SAZERAC or DiGRAZIA.

  2. <u>The Terms of the Agreement between SAZERAC and DiGRAZIA</u>:

   (a)  SAZERAC shall pay to DiGRAZIA, subject to the condition set forth in paragraph 3, below:

    (i) Upon the effective date of the Definitive Agreement between SAZERAC and HERRADURA, a payment of $25 per 9L case equivalent with respect to the first 20,000 cases comprising the Seagram Inventory existing on the effective date of the Definitive Agreement.

    (ii) A payment on the purchases of the Brands (other than the Seagram Inventory) by SAZERAC of $14 per 9L case equivalent until a total of $2,000,000 has been paid to DiGRAZIA (including the payment described in (i) above). If by December 31, 1998, SAZERAC has not made to DiGRAZIA payments totaling $2,000,000, SAZERAC will pay to DiGRAZIA, on that date, an amount equal to the difference between actual payments made and $2,000,000.  Notwithstanding the preceding sentence, if the performance of the Definitive Agreement is postponed pursuant to the force majeure terms of the Definitive Agreement, then the date for achieving such $2,000,000 target shall be postponed by the length of the delay due to the force majeure event.  Notwithstanding anything to the contrary in this paragraph 2(a)(ii), if the Definitive Agreement is terminated prior to December 31, 1998, SAZERAC is obligated to pay to DiGRAZIA only the amount of payments that accrued through the date of termination.

    (iii) After such $2,000,000 target has been achieved, then SAZERAC shall make to DiGRAZIA a payment on the

purchases of the Brands by SAZERAC of $6 per 9L case equivalent until the expiration of the initial term of the Definitive Agreement.

(iv) After such expiration, SAZERAC shall make to DiGRAZIA a payment on the purchases of the Brands by SAZERAC of $3 per 9L case equivalent so long as SAZERAC continues to purchase and distribute the Brands.

(v) For purposes of this paragraph 2(a), purchases by SAZERAC from HERRADURA shall be deemed to have occurred when ownership of the Brands has transferred from HERRADURA to SAZERAC at the F.O.B. point, as provided in the Definitive Agreement.

(vi) Payments under paragraphs 2(a)(ii),(iii) and (iv) shall be made on the thirtieth (30th) day of the month following the month with respect to which they are due.

(b) Except for paragraph 1, DiGRAZIA will relinquish all of his rights under the Letter Agreement, effective upon the effective date of the Definitive Agreement, to the extent that such rights conflict with the rights granted by HERRADURA to SAZERAC under the Definitive Agreement, including any rights to appoint importers, agents or distributors for the Brands in the Territory during the term of the Definitive Agreement.

(c) Other than as provided herein, the terms of this Agreement will be held confidential by SAZERAC and DiGRAZIA and will not be disclosed to HERRADURA or to any third party, unless such disclosure is required by an order, statute, decree, ordinance, law or regulation.

3.   Condition:  The obligations of SAZERAC and DiGRAZIA to consummate the transactions contemplated under this Agreement shall be subject to and conditioned upon the execution and delivery of the Definitive Agreement.

4.   Termination:  If the condition set forth in paragraph 3 above has not earlier been satisfied, this Agreement shall terminate at 5 p.m. Pacific time on November 30, 1991, or upon cessation of active negotiations in good faith with respect to the Definitive Agreement, whichever occurs earlier.

5.   Venue; Governing Law:  The proper and exclusive forum for litigation of any disputes or controversies arising out of or relating to this Agreement shall be the federal or state courts in the State of California.  This Agreement shall be construed and interpreted in accordance with the laws of the State of California, without regard to choice of law rules.

6.   Binding Effect; Assignment:  Neither DiGRAZIA nor SAZERAC shall assign nor transfer this Agreement or any rights

granted or obligations assumed hereunder, directly or indirectly (whether by operation of law or otherwise), without the prior written consent of the other, other than by an assignment by DiGRAZIA to his heirs or designated beneficiaries with respect to his right to receive payments hereunder.  The terms and provisions of this Agreement shall bind and inure to the benefit of the permitted successors and assigns of DiGRAZIA and SAZERAC.  Any purported assignment or transfer in contravention of this paragraph shall be void and without effect.

7.  <u>Severability</u>:  If any portion of this Agreement shall be determined to be invalid or unenforceable, the remainder shall be valid and enforceable to the maximum extent permitted by law.

8.  <u>Entire Agreement</u>:  This Agreement constitutes the entire understanding and agreement between DiGRAZIA and SAZERAC and cancels and supercedes any prior negotiations, understandings and agreements, whether verbal or written, with respect thereto.

9.  <u>Modification</u>:  This Agreement may be altered, amended or modified only by a written instrument duly executed by DiGRAZIA and SAZERAC.

10.  <u>Captions</u>:  The captions, headings and titles to paragraphs of this Agreement are for convenience only, and shall in no way restrict, affect or be of any weight in the interpretation of any provision of this Agreement.

11.  <u>Attorneys Fees</u>:  In any action or proceeding with respect to or arising out of this Agreement, the prevailing party will be entitled to recover the reasonable fees and disbursements of its counsel.

12.  <u>Counterparts</u>:  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which taken together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

LORIS M. DiGRAZIA

SAZERAC COMPANY, INC.

By:

PETER W. H. BORDEAUX
PRESIDENT

# EXHIBIT B

<u>AGREEMENT</u>

This Agreement is entered into on the 21st day of October, 1991 between TEQUILA HERRADURA, S.A., a corporation organized under the laws of Mexico, having its principal place of business at Av. 16 De Septiembre 635, Guadalajara, Jalisco, Mexico (hereinafter referred to as "HERRADURA") and SAZERAC COMPANY, INC. (hereinafter referred to as "SAZERAC"), a corporation organized under the laws of the State of Louisiana of the United States of America, having its principal place of business at 803 Jefferson Highway, New Orleans, Louisiana, U.S.A. 70121;

WHEREAS, HERRADURA is a producer, bottler and exporter of tequila known under the names Herradura Gold, Herradura Silver and Herradura Anejo (hereinafter referred to as the "Brands"); and

WHEREAS, SAZERAC is an importer, seller, marketer and distributor of spirits products in the United States of America, which includes its territories and possessions, including Puerto Rico and the U.S. Virgin Islands, and the District of Columbia. (The United States of America, the above-described territories and, within the U.S. and such territories, airlines, ship chandlers, duty free shops, embassies and military installations, are hereinafter referred to as the "Territory"); and

WHEREAS, HERRADURA owns and/or has registered or applied for registration in the United States Patent and Trademark Office for various trademarks for the Brands for use in the Territory, particulars of which are set forth in Schedule A, to which other trademarks for the Brands for use in the Territory owned by HERRADURA may be added from time to time (hereinafter collectively referred to as the "Trademarks"); and

WHEREAS, HERRADURA has terminated any and all of its prior distribution arrangements with the House of Seagram ("SEAGRAM") for the distribution of the Brands; and

WHEREAS, HERRADURA wishes to appoint SAZERAC as its exclusive importer, seller, marketer and distributor of the Brands in the Territory and to authorize SAZERAC to use the Trademarks and any related tradenames and copyrighted materials in connection therewith; and

WHEREAS, SAZERAC wishes to accept said appointment; and

WHEREAS, SAZERAC will purchase from SEAGRAM the inventory of the Brands held by SEAGRAM (the "Seagram Inventory").

NOW, THEREFORE, in consideration of the mutual promises contained herein, HERRADURA and SAZERAC agree as follows:

GENERAL TERMS

1.    Appointment:    HERRADURA hereby appoints SAZERAC as the exclusive importer, seller, marketer and distributor of the Brands in the Territory, as of the effective date of this Agreement.

2.    Best Efforts:

(a)   SAZERAC shall use its best efforts to import, sell, market and distribute the Brands in the Territory.   Such efforts shall be directed toward establishing and maintaining the Brands as premium products in the distilled spirits industry.

(b)   HERRADURA shall use its best efforts to maintain blue agave production from the land currently owned or controlled by HERRADURA and to maintain its distilling, bottling and export capacity in order to meet SAZERAC's volume requirements.

3.    Payments:

(a)   In consideration for the rights granted by HERRADURA to SAZERAC under this Agreement, HERRADURA acknowledges that SAZERAC will make the following payments to Loris M. DiGrazia ("DiGRAZIA"), the U.S. representative of HERRADURA:

(i)    An initial payment upon the effective date of this Agreement; and

(ii)   Subsequent, periodic payments based upon purchases of the Brands by SAZERAC.

Such payments shall be in addition to SAZERAC's obligations to HERRADURA under this Agreement.

(b)   Simultaneously with the execution of this Agreement, HERRADURA shall execute and deliver a release, in the form annexed hereto as Appendix 1, relating to the payments described in sub-paragraph 3(a).

4.    Brands Currently In Distribution:   HERRADURA acknowledges that SAZERAC does not assume responsibility, liability or obligation under this Agreement with respect to any of the Brands that are in distribution in the Territory prior to the effective date of this Agreement, except for the Seagram Inventory that shall be purchased by SAZERAC from SEAGRAM pursuant to paragraph 7(d) of this Agreement.

9267d:12532-00002:910923                    -2-

5.   <u>Effective Date and Term</u>:  This Agreement is effective as of January 1, 1992.  This Agreement, unless terminated earlier as provided herein, shall remain in full force and effect for a period of twenty (20) years from the effective date of this Agreement.

<u>OPERATIONS</u>

6.   <u>Ordering and Delivery of Merchandise</u>:

(a)  SAZERAC shall order such quantities of the Brands as shall reasonably be required for sale and for maintenance of adequate inventories in the Territory.

(b)  <u>Calendar Year Shipment Orders</u>:  On or before October 31, 1992, SAZERAC shall order, by sizes, its requirements for shipments by Herradura of:

(i)   HERRADURA SILVER, for 1993;

(ii)  HERRADURA GOLD, for 1993 and 1994; and

(iii) HERRADURA ANEJO for 1993, 1994 and 1995.

On or before October 31, 1993 and on October 31 of each succeeding year of this Agreement, SAZERAC shall order, by sizes, its requirements for shipments by Herradura of:

(i)   HERRADURA SILVER, for the subsequent calendar year;

(ii)  HERRADURA GOLD, for the second subsequent calendar year; and

(iii) HERRADURA ANEJO, for the third subsequent calendar year.

(c)  With respect to SAZERAC'S first order of each of the Brands, SAZERAC agrees that it shall not order a quantity of 9 liter case equivalent of the Brands that exceeds 120% of the depletions by SAZERAC of the Seagram Inventory during the preceding 12 months, unless HERRADURA otherwise agrees.  With respect to subsequent orders of the Brands, SAZERAC agrees that it shall not order quantities that exceed 120% of the quantities of 9 liter case equivalent of the Brands ordered for the preceding calendar year, unless HERRADURA otherwise agrees; provided, however, that SAZERAC may order a quantity sufficient to provide enough inventory to meet the requirements of paragraph 15.

(d)  All purchase orders shall be in writing and given in accordance with sub-paragraph 24(g).

(e)  HERRADURA agrees to fill all purchase orders from SAZERAC for a given year, given in accordance with the terms of this Agreement, as soon as possible after February 1 of such year but no later than July 31 of such year.  An order will be deemed filled when the Brands are available for shipment at the distillery in Amatitan and a notification thereof has been sent to SAZERAC pursuant to sub-paragraph 24(g).

(f)  The Brands shall be purchased by and sold to SAZERAC as finished, bottled goods.

7.    Prices and Purchase of the Seagram's Inventory:

(a)  HERRADURA shall sell the Brands to SAZERAC and shall invoice SAZERAC at prices expressed in U.S. dollars, FOB – HERRADURA's distillery in Amatitan, per case of finished product.  Title and risk of loss with respect to the Brands shall pass from HERRADURA to SAZERAC upon loading of the Brands onto the carrier at the FOB location for shipment to SAZERAC. Such carrier shall be as designated by SAZERAC.

(b)  HERRADURA's initial prices to SAZERAC for the Brands shall be as set forth in Schedule B.

(c)  HERRADURA shall have the right, in its sole and absolute discretion, from time to time, to change its prices to SAZERAC for the Brands, taking into consideration HERRADURA's production economics for the Brands, SAZERAC's then current sales and marketing strategy for the Brands, and tequila consumption and competitive conditions in the Territory, after consulting in good faith with SAZERAC.  Notwithstanding the foregoing, except for net deviations for currency exchange rates between the peso and the dollar, HERRADURA will not increase the prices to SAZERAC for the Brands prior to October 31, 1994. Prices in effect on the date an order is given shall apply to that order; provided, however, that with respect to the October 31, 1994 order date, 50% of the quantities ordered will be at prices in effect prior to that date and 50% of the quantities ordered will be at prices effective on that date. HERRADURA shall provide to SAZERAC ninety (90) days notice of any price change, the sole purpose of which is to enable SAZERAC to post prices in a timely manner.

(d)  As soon as practicable after the effective date of this Agreement, SAZERAC shall purchase the Seagram Inventory and any related point of sale material from SEAGRAM at prices based on analogous formalaes for SEAGRAM contained in paragraph 21 of this Agreement and on such terms as SAZERAC and SEAGRAM shall agree.  HERRADURA shall reimburse SAZERAC for the cost of such point of sale material, if any, in an amount not to exceed $7,700.

(e)  On the effective date of this Agreement, SAZERAC shall pay to HERRADURA the sum of the following amounts with respect to the purchase of the Seagram Inventory:

| | |
|---|---|
| Herradura Silver | $3.69 per 9L case equivalent |
| Herradura Gold | $13.73 per 9L case equivalent |
| Herradura Anejo | $30.00 per 9L case equivalent |

8.  Payment Terms:  HERRADURA's terms of payment shall be net cash by wire transfer in immediately available funds upon notice that an order has been filled in accordance with sub-paragraph 6(e).  Payment by SAZERAC shall be made in U.S. dollars and shall be paid to such location as HERRADURA from time to time shall advise SAZERAC in writing.

9.  Bottled Goods Inventories:  SAZERAC agrees to receive, transport from the distillery in Amatitan, and store the Brands, or to designate specific distributors to receive and transport the Brands from the distillery in Amatitan.  The Brands shall be sold in the same bottles and containers, with the same labels, and in all other respects in the same condition as when shipped to SAZERAC by HERRADURA.

10.  Sales And Distribution:

    (a)  Prices:  SAZERAC shall have the right, in its sole discretion, to establish the prices at which it will sell the Brands in the Territory, taking into consideration its then current sales and marketing strategy for the Brands, tequila consumption and competitive conditions in the Territory, and HERRADURA's prices to SAZERAC for the Brands.  Notwithstanding the above, SAZERAC shall maintain, at all times, the prices of the Brands at a level consistent with their status as premium products in the distilled spirits industry.

    (b)  SAZERAC shall have the right in its sole discretion to appoint distributors and brokers for the Brands throughout the Territory.

    (c)  SAZERAC shall undertake to perform the customary customer order, billing, credit and price posting functions associated with the sale and distribution of the Brands in the Territory.

    (d)  SAZERAC undertakes to obtain all licenses, approvals and permits necessary for SAZERAC to fulfill its duties under this Agreement, or necessary to otherwise comply with applicable government laws and regulations.  HERRADURA agrees to cooperate fully with SAZERAC, as necessary, in connection with the obtaining of such required licenses, approvals and permits.

11.  Marketing:

(a)  Brand Spending:  SAZERAC shall provide brand spending for three (3) years commencing on the effective date of this Agreement totalling in the aggregate at least $12 per 9 liter case equivalent of the Brands sold by SAZERAC to its distributors during such period.  Such brand spending shall include advertising, merchandising, promotion, research, packaging changes, public relations, distributor incentive programs, tastings, and similar brand building activities.  Said Brand spending shall not include SAZERAC's overhead costs or compensation to any SAZERAC employee relating to the Brands.

(b)  Use of Trademarks

(i)  HERRADURA grants to SAZERAC the exclusive right to use the Trademarks and any related tradenames and copyrighted materials in the Territory for purposes of designating the importer of the Brands and for merchandising, advertising and promoting the Brands, provided that SAZERAC shall not use the Trademarks, tradenames or copyrighted materials for any merchandising, advertising or promotional purpose to which HERRADURA shall reasonably object, in writing, including, but not limited to disparaging another brand of Tequila or which shall be limited or prohibited by Mexican government laws or regulations.

(ii)  HERRADURA agrees that, from time to time and upon reasonable request by SAZERAC, it will cause, at its own expense, one or more applications to be filed in the Territory to register the Trademarks.

(iii)  HERRADURA shall maintain registration of the Trademarks in the Territory by filing registration renewals and proof of use of the Trademarks. HERRADURA shall, if permitted or required, register SAZERAC as the exclusive licensee of the Trademarks in the Territory.

(iv)  HERRADURA agrees not to sell, encumber, license or otherwise dispose of, or grant any right in, the Trademarks or the goodwill relating thereto, affecting the Territory, to any person or entity during the term of this Agreement, without the written authorization of SAZERAC.

(c)  Cooperation:  HERRADURA shall cooperate, as SAZERAC may reasonably request from time to time, in connection with SAZERAC's marketing efforts.

12.  New Brands:

    (a)  If HERRADURA intends during the term of this
Agreement, to market a new tequila in the Territory under or
using the Trademark HERRADURA:

        (i)   HERRADURA shall so notify SAZERAC and, at SAZERAC's
              request, HERRADURA shall appoint SAZERAC as the
              exclusive importer, seller, marketer and distributor
              in the Territory of any such tequila; such appointment
              shall be governed by the terms of this Agreement; the
              Brands shall be deemed to be amended to include said
              product; and Schedule A shall be deemed amended to
              include said Trademarks; and

        (ii)  HERRADURA shall register in the Territory any
              trademarks for said tequila and grant to SAZERAC the
              exclusive right to use said trademarks and any related
              tradenames and copyrighted materials in the Territory
              pursuant to paragraph 11(b)(i), and shall otherwise
              comply with the applicable requirements of paragraph
              11(b).

    (b)  HERRADURA shall not produce, sell, market or
distribute, directly or indirectly, any other tequila in the
Territory, during the term of this Agreement, without SAZERAC'S
prior written consent.

    (c)  SAZERAC represents that, as of the execution date of
this Agreement, it imports, sells, markets or distributes in the
Territory the brands of tequila listed below:

                  Torada, Tijuana, Tina and Ole

SAZERAC shall not produce, sell, market or distribute, directly
or indirectly, any tequila in the Territory, other than the
brands listed above, without HERRADURA's prior written consent.

13.  Quality Control:

    (a)  The Brands that HERRADURA produces, sells and delivers
under this Agreement shall consist of 100% Blue Agave, shall be
of uniform and good quality, merchantable, and fit for sale and
consumption, and shall be bottled, packaged and labeled in
conformity with, and shall fully comply with, all applicable
laws and regulations of Mexico and the laws applicable to the
Territory.  SAZERAC shall promptly notify HERRADURA of any
changes in applicable laws and regulations within the Territory
of which it becomes aware relating to the provisions of this
sub-paragraph 13(a).

(b) SAZERAC shall conduct reasonable sampling, testing, and such other procedures as it sees fit to ensure that the quality of the Brands that HERRADURA sells and delivers under this Agreement is in compliance with all applicable laws and regulations within the Territory.

(c) SAZERAC shall be entitled to receive from HERRADURA, upon request, and without charge, a reasonable quantity of samples of the Brands for quality control testing and evaluation purposes.

(d) HERRADURA agrees to allow SAZERAC to make such on-site inspection visits as may be reasonably requested in connection with this paragraph 13, provided, however, that such inspections shall be conducted at times reasonably convenient to HERRADURA and that reasonable notice be given in advance of such inspections.

(e) HERRADURA agrees that the quality level of its labels, packaging and shipping materials for the Brands shall be consistent with industry standards.

(f) SAZERAC shall take such remedial steps as it deems necessary in the event that the Brands are not merchantable and fit for sale and consumption or do not comply with all applicable laws and regulations of Mexico and of each jurisdiction within the Territory. SAZERAC shall promptly notify HERRADURA of the necessity for such remedial steps. The costs reasonably incurred in connection with such remedial steps shall be borne by HERRADURA, provided, however, that SAZERAC shall take reasonable and appropriate actions to minimize the cost of such remedial steps.

(g) SAZERAC's failure to make quality surveillance under sub-paragraphs 13(b), (c) and (d) or to discover defects in the Brands shall not relieve HERRADURA of its obligations and liabilities under sub-paragraphs 13(a) and (e).

14. Information:

(a) SAZERAC shall provide HERRADURA, in a prompt manner but within 60 days after the end of the applicable period, with the following data on each Brand in the Territory:

(i) Each month, depletions by state, total depletions by size, and any changes in SAZERAC's lowest FOB prices in any market by size; and

(ii) Each quarter, total advertising and other Brand support and SAZERAC's inventories of the Brands by size.

(b)  HERRADURA and SAZERAC shall promptly bring to the attention of the other any information that it considers likely to be of use or benefit to the other in relation to the sale and marketing of the Brands within the Territory.

(c)  HERRADURA and SAZERAC shall provide such other information as shall be reasonably requested by the other party.

15.  Review Procedures:

(a)  HERRADURA and SAZERAC shall meet, at a mutually convenient time and location, between January 1, 1995 and April 30, 1995, to review the parties' performance under this Agreement.  As a result of this review, HERRADURA may terminate this Agreement, by giving, no later than July 1, written notice, in the event that the total volume of the Brands sold by SAZERAC to its distributors during the calendar year 1994 for sales in the Territory is below 150% of the total volume of the Brands sold by SEAGRAM to its distributors during the 12 month period ending on December 31, 1991.  Notwithstanding the foregoing, no such termination pursuant to this paragraph 15(a) shall occur if HERRADURA increases its prices for the Brands between the effective date of this Agreement and June 30, 1994 by more than an aggregate of 10%.  Said termination is to be effective on December 31 of the year of the review, unless HERRADURA and SAZERAC agree to an earlier effective date.

(b)  HERRADURA and SAZERAC shall meet subsequently, at a mutually convenient time and location, between January 1 and April 30 of 1998, 2001, 2004, 2007 and 2010, to review the parties' performance under this Agreement.  As a result of these reviews, HERRADURA may terminate this Agreement, by giving, no later than July 1 of the year of the review, written notice, in the event that, for the period of the three (3) previous calendar years, the average annual percentage growth rate of volume of the Brands sold by SAZERAC to its distributors is below three (3) times the average annual percentage growth rate of imports for the Tequila category as announced by the National Association for Beverage Importers ("NABI") for that three year period.  If at any time, NABI does not publish the annual growth rate for the category, then the parties shall agree on a new source for such information.  Said termination is to be effective on December 31 of the year of the review, unless HERRADURA and SAZERAC agree to an earlier effective date. Notwithstanding the foregoing, no such termination of this Agreement pursuant to this paragraph 15(b) shall occur after any such date, if HERRADURA has increased its prices for the Brands by more than an aggregate of 10% during the three (3) calendar years immediately preceding such date.

16.   <u>Protection of Trademarks</u>:

(a)  The Trademarks and all goodwill associated therewith shall remain the sole property of HERRADURA and shall be registered and maintained in the name of HERRADURA.  SAZERAC recognizes HERRADURA'S title to the Trademarks and shall not at any time do or suffer to be done any act or thing which will in any way impair the rights of HERRADURA in and to the Trademarks.  It is understood that SAZERAC shall not acquire and shall not claim any title to the Trademarks adverse to HERRADURA's by virtue of this Agreement, or through SAZERAC's use of Trademarks, it being the intention of the parties that all use of the Trademarks by SAZERAC shall at all times inure to the benefit of HERRADURA.

(b)  SAZERAC shall notify HERRADURA of any use of the Trademarks in the Territory by third parties that comes to its attention and that it reasonably believes may constitute an infringement or act of unfair competition involving the Trademarks.

(c)  HERRADURA, at its own expense, shall maintain and protect the Trademarks in the Territory during the term of this Agreement.  HERRADURA shall take appropriate action, other than litigation, to end any infringements or acts of unfair competition in the Territory with respect to the Trademarks, and may, in its sole discretion, institute legal action where necessary to prosecute third parties for infringement or unfair competition with respect to the Trademarks and to defend any action involving such Trademarks.  If HERRADURA brings or defends such suit, SAZERAC shall cooperate fully with HERRADURA in the prosecution or defense.  If HERRADURA determines not to bring or defend such suit, then SAZERAC may, with the written consent of HERRADURA, institute or defend such suit at its own cost, and HERRADURA shall cooperate fully with SAZERAC in the prosecution or defense.  Notwithstanding any other provision of this Agreement, if HERRADURA determines not to bring or defend such suit and refuses to consent to the institution or defense by SAZERAC, as a result of which SAZERAC's right to use the Trademarks in the Territory is materially diminished or impaired, SAZERAC may terminate this Agreement upon three (3) months notice of such refusal, without obligation to HERRADURA.

17.  <u>Confidential Information</u>:

Neither HERRADURA nor SAZERAC shall, without the written consent of the other, disclose to any third party, other than to the extent necessary to implement this Agreement, any confidential information, including proprietary information regarding formulations, techniques, processes, standards and procedures or any proprietary distribution, production or

marketing information, relating to the Brands provided to it by the other or any confidential information to which either party acquires access in performing its obligations hereunder, unless such disclosure is required by an order, statute, decree, ordinance, law or regulation. None of the following, for purposes of the provisions of this paragraph, shall be considered confidential:

    (i)    any matter that was in the party's possession before it received such information pursuant to the relationship established by this Agreement;

    (ii)    any matter that was in the public domain as of the effective date of this Agreement or that thereafter becomes part of the public domain by publication or other means through no breach of this Agreement; or

    (iii)    any matter that is provided by a third party that, to the knowledge of the party receiving such information, is not the result of an unauthorized act or omission of said third party or in violation of any obligation owed to the party providing the information by said third party.

The provisions of this paragraph 17 shall survive termination or expiration of this Agreement.

18.    <u>Indemnification</u>:

    (a)    <u>Product/General Liability</u>:

    (i)    HERRADURA shall defend, indemnify and hold harmless SAZERAC and its affiliates, officers, directors, employees and agents from and against all liabilities, penalties, costs, losses, damages, claims, causes of action, judgments and expenses, including attorneys' fees, arising out of or in connection with (A) SAZERAC's use, in accordance with the terms of this Agreement, of the Trademarks, tradenames and copyrighted materials; (B) death or injury to persons or damages or loss to property in any way arising out of or connected with the performance of HERRADURA's obligations under this Agreement and/or the quality or condition of the Brands or bottles, including any impurity, adulteration or misbranding of the Brands, except with respect to, and to the extent of, matters for which SAZERAC shall indemnify HERRADURA pursuant to sub-paragraph 18(a)(ii); and (C) any breach by HERRADURA of any term, condition, representation, warranty or covenant of this Agreement. All of the provisions of this paragraph shall apply to the Seagram Inventory.

9267d:12532-00002:910923           -11-

(ii)   SAZERAC shall defend, indemnify and hold harmless
HERRADURA and its affiliates, officers, directors,
employees and agents from and against all liabilities,
penalties, costs, losses, damages, claims, causes of
action, judgments and expenses, including attorneys'
fees, arising out of or in connection with (A) any
unauthorized use by SAZERAC of the Trademarks,
tradenames and copyrighted materials; (B) death or
injury to persons or damages or loss to property in
any way arising out of or connected with any willful
misconduct or negligence of SAZERAC, its employees,
agents or representatives in performing its
obligations relating to the importation, sale,
marketing and distribution of the Brands; and (C) any
breach by SAZERAC of any term, condition,
representation, warranty, or covenant of this
Agreement.

(b)   <u>Prior Distribution Arrangements of HERRADURA</u>:

(i)   It shall be the responsibility and obligation of
HERRADURA to take such action as may be necessary, at
its sole cost and expense, with respect to any agency,
distributorship, brokerage or other arrangement
relating to the Brands in the Territory in existence
prior to the commencement of the term of this
Agreement, for it to fully perform and comply with the
provisions of this Agreement.

(ii)   HERRADURA shall indemnify, hold harmless and defend
SAZERAC and its affiliates, officers, directors,
employees and agents from and against any liabilities,
penalties, costs, losses, damages, claims, causes of
action, judgments and expenses arising out of or in
connection with (A) any such agency, distributorship,
brokerage or other arrangement; (B) any Brands sold
while any such agency, distributorship, brokerage or
other arrangement was in effect; and (C) any action or
omission by HERRADURA or any such agent, distributor
or broker in connection with either (A) or (B).

(iii)   The foregoing indemnification shall not apply to
claims resulting from distributor or broker changes
made by SAZERAC from and after the effective date of
this Agreement, except to the extent that any damages
determined by a Court of competent jurisdiction to be
owing to such distributor or broker arise out of or
are based upon promises, understandings or agreements,
whether written or oral, found by such Court to have
been made by or on behalf of HERRADURA prior to the
effective date of this Agreement.

(iv)   Either HERRADURA or SAZERAC may settle, without the consent of the other, any such claim, arising from distributor or broker changes made by SAZERAC from and after the effective date of this Agreement, that are based upon promises, understandings or agreements, whether written or oral, alleged to have been made by or on behalf of HERRADURA.  In the event of such settlement, the settling party shall be solely responsible for any amounts paid in connection therewith, unless the parties agree otherwise, and each party shall bear its own legal fees.

(c)   The provisions of this paragraph 18 shall survive termination or expiration of this Agreement.  Upon receiving actual knowledge of a matter for which SAZERAC or HERRADURA seeks to be indemnified hereunder, SAZERAC or HERRADURA shall promptly notify the other of the same within a reasonable period of time.

19.   Insurance:

(a)   SAZERAC shall, during the term of this Agreement, at its sole cost and expense, obtain and maintain, in full force and effect, insurance with responsible companies as follows:

(i)   Workers' Compensation Insurance sufficient to provide statutory workers' compensation benefits as required by the laws of the applicable jurisdictions for all of SAZERAC's employees engaged in work under this Agreement and Employer Liability Insurance on an "occurrence basis" with an adequate minimum per occurrence; and

(ii)   Comprehensive General Liability Insurance, including product liability and contractual liability coverage on an "occurrence basis" of a minimum of $1,000,000 per occurrence covering all operations of SAZERAC, as named insured, including coverage for liability imposed by the indemnity and hold harmless agreements set forth in this Agreement, against claims for bodily injury or death, including personal injury and property damage.  The comprehensive general liability insurance policy, or subsequent renewal policies, that SAZERAC is required to obtain under the terms of this sub-paragraph 19(a)(ii) shall be maintained at the same limits herein set forth for a period extending at least one full calendar year beyond the expiration date of this Agreement or, if terminated earlier, at least one full calendar year beyond the effective date of any termination of this Agreement.

(b)  HERRADURA shall, during the term of this Agreement, at its sole cost and expense, obtain and maintain in full force and effect, insurance with responsible companies as follows:

(i)  Property insurance covering loss, damage or destruction of its plant, including its blending, bottling, packaging, storing and shipping process, and any property that will be located at the plant, on a replacement cost basis; and

(ii)  Comprehensive General Liability Insurance, including product liability and contractual liability coverage applicable throughout the Territory on an "occurrence basis" of a minimum of $2,000,000 per occurrence, covering all operations of HERRADURA, as named insured, including coverage for liability imposed by the indemnity and hold harmless agreements set forth in this Agreement, against claims for bodily injury or death, including personal injury and property damage. HERRADURA shall designate a representative located in the U.S., which may be the insurer, to whom claims may be referred by SAZERAC. The Comprehensive General Liability Insurance policy, or subsequent renewal policies, that HERRADURA is required to obtain under the terms of this sub-paragraph 19(b)(ii) shall be maintained at the same limits herein set forth for a period extending at least one full calendar year beyond the expiration date of this Agreement or, if terminated earlier, at least one full calendar year beyond the effective date of any termination of this Agreement.

(c)  All liability insurance policies that SAZERAC and HERRADURA are required to obtain and maintain under the terms of this paragraph shall provide that the other party shall be an additional named insured.  In addition, all policies shall contain an agreement on the part of the insurers that, in the event of cancellation of the policy in whole or in part, or a reduction as to coverage or amount thereof, whether initiated by the insurer or the insured, the insurer shall give thirty (30) days advance written notice to the additional insured prior to such cancellation or reduction in coverage.

20.  Force Majeure:

(a)  Neither SAZERAC nor HERRADURA shall be liable nor deemed in default under this Agreement for any failure to perform or delay in performing any of its respective obligations and agreements caused by or arising out of contingencies beyond the control of the parties, including but not limited to, acts of God, strikes, labor or other industrial disputes, floods,

fires, storms, lightening, explosions, civil commotions, war, riots, embargoes, interruption in transportation or power systems, detention of goods by customs authorities, U.S. or Mexican laws which restrict the exportability and/or importability of alcohol beverages, or any other casualty or contingency beyond the control of the parties.

(b)  No right of either HERRADURA or SAZERAC shall be affected by its failure to meet or delay in meeting any condition of this Agreement where such failure is caused by one of the contingencies referred to in sub-paragraph 20(a) and all times provided for in this Agreement shall be extended for a period commensurate with the periods of delay.

(c)  HERRADURA and SAZERAC each shall use all reasonable diligence to remove the cause of delay or prevention as quickly as possible.  HERRADURA and SAZERAC shall promptly notify the other party regarding such cause of delay or prevention resulting from a contingency listed in sub-paragraph 20(a), specifying the particulars of such cause and the day upon which it arose and shall give like notice forthwith following the date that such cause ceased to exist.

21.  Termination Or Expiration:

(a)  Grounds for Termination:  Either HERRADURA or SAZERAC shall have the right to terminate this Agreement upon ninety (90) days written notice, specifying the grounds therefor, which right shall be in addition to any other right to elect to terminate this Agreement pursuant to the terms hereof and to all other rights and remedies either party may have, if the other party:

(i)  Defaults in any material respect in the performance, or breaches in a material respect any of the terms or conditions of this Agreement, or any warranty, covenant or representation made in this Agreement and does not cure same within sixty (60) days of having been notified in writing of such breach or default, unless such cure is capable of being made and is being diligently prosecuted.

(ii)  Ceases to have in effect a valid license, permit or consent required or necessary for it to perform in all material respects under this Agreement, whether such license, permit or consent has been revoked, has failed to be renewed, or has been suspended for more than thirty (30) days, unless a cure is capable of being made and is being diligently pursued.

(iii)  Commits an act of bankruptcy, or files a voluntary petition in bankruptcy or is declared a bankrupt in a voluntary proceeding, or files a petition for reorganization or a petition proposing a plan or arrangement under the Bankruptcy Code or any law of any jurisdiction having similar purposes, or has any such petition approved or any such plan or arrangement confirmed, or places its affairs in the hands of a receiver, or makes a general assignment for the benefit of its creditors or enters into an arrangement or composition for the benefit of creditors or ceases doing business or is dissolved.

(iv)  Has a final judgment rendered against it which remains unsatisfied, unstayed or otherwise unsuperseded for thirty (30) days, and is substantial in relation to such party's assets.

(v)  Sells, transfers or changes ownership or control or sells or transfers a material portion of its total physical assets, except for (A) any sale, transfer or change of ownership or control of HERRADURA, as a result of which HERRADURA remains under the direct or indirect ownership or control of the Romo de la Pena family or (B) any sale, transfer or change of ownership or control of SAZERAC, as a result of which SAZERAC remains under the direct or indirect ownership or control of the Goldring family.

(vi)  Assigns, subcontracts, or attempts to assign or subcontract, an interest in all or any part of this Agreement, except as expressly permitted in this Agreement.

(b)  Rights and Obligations Upon Termination or Expiration of this Agreement.

(i)  Upon notice of termination of this Agreement for any reason, or during the period prior to expiration of this Agreement, HERRADURA and SAZERAC in good faith shall take whatever action is necessary to effect as orderly a transition as possible and to maintain the Brands as premium products in the Territory. HERRADURA shall make all efforts necessary to enable SAZERAC to fill all orders for the Brands within the Territory accepted by SAZERAC prior to the effective date of the termination or the expiration date. All orders accepted by SAZERAC prior to the effective date of the termination or the expiration date shall be for SAZERAC's account and HERRADURA shall undertake all reasonable efforts necessary to ensure that any

payment received by HERRADURA or a successor agent, distributor or broker with respect to such orders shall be disbursed to SAZERAC upon receipt.

(ii)    At least thirty (30) days prior to the effective date of termination or expiration of this Agreement, SAZERAC shall advise HERRADURA of (A) its then outstanding orders and the approximate amount and location of its inventory of Brands, (B) its inventory of supplies, merchandising, advertising and promotional materials and (C) its outstanding contractual commitments for supplies, merchandising, advertising and promotional materials relating to the Brands, entered into prior to receipt of the notice of termination. SAZERAC shall, at the same time, advise HERRADURA of the value of the Brands, materials and commitments referred to above, computed in accordance with sub-paragraph 21(b)(v).

(iii)    HERRADURA's and SAZERAC's rights and obligations upon termination of this Agreement shall be as follows: (A)    if this Agreement terminates because of the expiration of the term of this Agreement pursuant to paragraph 5 or because of a scheduled review pursuant to paragraph 15, then HERRADURA shall be required to buy back the inventory owned by SAZERAC and all rights and obligations of HERRADURA AND SAZERAC shall be as set forth on Schedule C. If HERRADURA has appointed a new distributor before the effective date of termination of this Agreement, such purchase shall be made within thirty (30) days after such effective date. If, however, a new distributor is not appointed before the effective date of termination of this Agreement, then HERRADURA shall extend the distribution arrangement with SAZERAC until the first to occur of the following: (i) the appointment by HERRADURA of a new distributor, or (ii) the disposition of the remaining inventory held by SAZERAC. Thirty (30) days after the appointment of a subsequent distributor under (i) above, then HERRADURA will be required to repurchase the remaining inventory of the Brands. The required repurchase shall be on the terms described in paragraph 21(b)(v) of this Agreement. (B)    If this Agreement is terminated for any other reason, the rights and obligations of HERRADURA and SAZERAC shall be as set forth on Schedule C. (C)    Neither SAZERAC's nor HERRADURA's compliance, with its obligations hereunder shall constitute a waiver of rights to any other damages to which it shall otherwise be entitled, including damages arising out of said compliance, and such compliance shall not negate other rights and obligations of the parties pursuant to this Agreement.

(iv) HERRADURA shall not be required to repurchase the Brands or the supplies, merchandising, advertising or promotional materials that are incapable of being used as a result of wear and tear or other physical condition or obsolescence. Any Brands or materials that HERRADURA is not required to, and does not, repurchase may be sold or transferred by SAZERAC, with HERRADURA's consent, which shall not be unreasonably withheld.

(v) Brands, materials, and outstanding contractual obligations that are repurchased by HERRADURA under sub-paragraph 21(b)(iii) and Schedule C, shall be valued as follows: (A) with respect to the Brands, priced FOB SAZERAC-designated warehouses, including SAZERAC's purchase and shipping costs, as well as tax and duty, (B) with respect to supplies, merchandising, advertising and promotional materials produced or purchased by SAZERAC, priced FOB SAZERAC-designated warehouses, including the cost for such materials plus handling expenses, and (C) with respect to outstanding contractual obligations, the amount of money necessary to satisfy that portion of SAZERAC'S contractual obligations as described in sub-paragraph 21(b)(ii)(c), which relate to services and materials to be provided subsequent to the effective date of the termination.

(vi) Title and risk of loss with respect to the Brands and materials shall pass from SAZERAC to HERRADURA upon shipment from the F.O.B. locations.

(vii) HERRADURA shall tender payment to SAZERAC for the Brands, materials, and outstanding Contractual obligations within thirty (30) days of assuming title, in U.S. dollars to a commercial bank in the U.S. designated by SAZERAC.

(viii) Upon termination of this Agreement for any reason, or upon expiration of this Agreement, HERRADURA and SAZERAC shall each transfer to the other all confidential information acquired from the other in the course of performing its obligations under this Agreement.

22. <u>Representations, Warranties and Covenants of HERRADURA and SAZERAC</u>:

(a) HERRADURA represents, warrants and covenants that:

9267d:12532-00002:910923                        -18-

(i)   HERRADURA is not now under any obligation of a
contractual or other nature to any person, firm or
corporation which is inconsistent or in conflict with
this Agreement, or which would prevent, limit or
impair in any way the performance by it of its
obligations hereunder.

(ii)  <u>Trademarks</u>:

(A)   The trademark described in the U.S. Trademark
registration referred to in Schedule A has been in use
without objection in the Territory in connection with
tequila since at least as early as 1979.

(B)   HERRADURA has no knowledge of any trademark or
tradename right of others in the Territory which would
be infringed by SAZERAC's use of the Trademarks in
connection with the Brands pursuant to this Agreement,
and represents that the Trademarks, tradenames and
copyrighted materials, and the use thereof by SAZERAC
in the fulfillment of this Agreement, shall not
infringe the rights of third parties.

(C)   HERRADURA owns all right, title and interest in the
U.S. Trademark registration referred to in Schedule A
and has the right to license the Trademarks,
tradenames and any copyrighted materials to be used in
connection with the Brands.

(b)   SAZERAC represents, warrants and covenants that
SAZERAC is not now under any obligation of a contractual nature
to any person, firm or corporation which is inconsistent or in
conflict with this Agreement, or which would prevent, limit or
impair in any way the performance by it of its obligations
hereunder.

(c)   The warranties contained in this Agreement shall not
be exclusive, but shall be in addition to any other express or
implied warranties provided by law or given herein. Each
warranty shall be considered to be independent and may be
construed, interpreted and enforced without reference to any
other warranty.

23.   <u>Relationship of Parties</u>:   Nothing in this Agreement shall
constitute or be deemed to constitute SAZERAC as the agent or
legal representative of HERRADURA or HERRADURA as the agent or
legal representative of SAZERAC for any purpose whatsoever.
Neither party is granted any express or implied right or
authority by the other party to assume or to create any
obligation or responsibility on behalf of, or in the name of,
the other party or to bind the other party in any manner

whatsoever. Neither SAZERAC nor HERRADURA shall incur any liability on behalf of the other or in any way pledge or purport to pledge the other's credit.

24. <u>Miscellaneous</u>:

(a) <u>Governing Law</u>: This Agreement shall be construed and interpreted in accordance with the laws of the State of California, without regard to choice of law rules.

(b) <u>Binding Effect; Assignment</u>: The terms and provisions of this Agreement shall bind and inure to the benefit of the successors and permitted assigns of HERRADURA and SAZERAC. Neither HERRADURA nor SAZERAC shall assign or transfer this Agreement or any rights granted or obligations assumed hereunder, directly or indirectly (whether by operation of law or otherwise), without the prior written consent of the other, other than to an affiliate or subsidiary. Any purported assignment or transfer in contravention of this paragraph shall be void and without effect.

(c) <u>Severability</u>: If any portion of this Agreement shall be determined to be invalid or unenforceable, the remainder shall be valid and enforceable to the maximum extent permitted by law.

(d) <u>Non-Waiver</u>: Except for time periods specifically prescribed in this Agreement for the giving of notices, failure of either party to exercise promptly any right granted in this Agreement, or to require strict performance of any obligation undertaken in this Agreement by the other party, shall not be deemed to be a waiver of such right or of the right to demand subsequent performance of any and all obligations in this Agreement undertaken by the other party.

(e) <u>Entire Agreement</u>: This Agreement, together with the following Schedules and Appendix:

Schedule A    Trademark Registrations

Schedule B    HERRADURA's Initial Prices

Schedule C    Rights And Obligations Upon Termination Of This Agreement

Appendix 1    Release

constitutes the entire understanding and agreement between HERRADURA and SAZERAC and cancels and supersedes any prior negotiations, understandings and agreements, whether verbal or written, with respect thereto.

(f) Amendment: This Agreement may be altered, amended or modified only by a written instrument duly executed by HERRADURA and SAZERAC.

(g) Notice: All notices that are required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given (i) on the same date if by personal delivery or by facsimile transmission; (ii) twenty-four (24) hours after deposit with a recognized international, overnight courier service, or (iii) three (3) days after mailing by certified or registered mail, postage prepaid, return receipt requested. The addresses of the parties for purposes of giving notice are:

If to HERRADURA:

    Tequila Herradura, S.A.
    Av. 16 De Septiembre 635
    Guadalajara, Jalisco, Mexico
    Attention: Guillermo Romo de la Pena

With a Copy to:

    Loris M. DiGrazia
    P.O. Box 608
    Brisbane, California 94005

If to SAZERAC:

    Sazerac Company, Inc.
    803 Jefferson Highway
    New Orleans, Louisiana, U.S.A.
    Attention: Peter W. H. Bordeaux

With a copy to:

    Fenwick & West
    Two Palo Alto Square, Suite 800
    Palo Alto, California, U.S.A.
    Attention: Scott Spector, Esq.

(h) Computation of Times: As used in this Agreement, any period of time computed in terms of days shall be computed to exclude the first and include the last day of such period. If the last day of any such period falls on a Saturday or Sunday or on a day that is a legal holiday in California, such day shall be omitted from the computation.

(i) Caption, etc.: The captions, headings and titles to paragraphs of this Agreement are for convenience only, and shall in no way restrict, affect or be of any weight in the interpretation of any provision of this Agreement.

9267d:12532-00002:910923        -21-

(j) <u>Counterparts</u>: This Agreement may be executed in one or more counterparts each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

(k) <u>Dispute Resolution</u>:

(i) <u>Arbitration</u> Any controversy or claim arising out of, or relating to, this Agreement, or the making, performance, or interpretation thereof, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association then existing, and judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy. Such arbitration shall take place in San Francisco, California or in such other location as mutually agreed by the parties.

(ii) <u>Litigation</u> HERRADURA and SAZERAC agree and intend that, if any litigation results notwithstanding (i) above, the proper and exclusive forum for such litigation shall be the federal or state courts in the State of California. HERRADURA and SAZERAC consent and submit to the jurisdiction of said courts and waive, to the extent they may effectively do so, any objection as to venue and forum non conveniens.

(iii) <u>Agents</u> HERRADURA hereby appoints Loris M. DiGrazia, 150 North Hill Drive, Brisbane, California 94005 to receive service of process on its behalf in any such action, suit or proceeding in said courts. SAZERAC hereby appoints Frank Wasserman, 3189 Cheviot Vista Place, #209, Los Angeles, California 90034 to receive service of process on its behalf in any such action, suit or proceeding in said courts. In the event that either agent no longer serves in this capacity, the applicable party shall immediately appoint another person to receive service of process on its behalf.

(1) <u>Language</u>. This document shall constitute the English language version of this Agreement. HERRADURA and SAZERAC intend to execute a Spanish language translation of this Agreement as soon as practicable after the effective date of this Agreement. HERRADURA and SAZERAC accept that the English and Spanish language translations of this Agreement shall be of equal standing, provided, however, that in the event of a conflict between the versions this Agreement in its English language version will be considered exclusively controlling.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

TEQUILA HERRADURA, S.A.

BY: _____
Guillermo Romo de la Pena
President


SAZERAC COMPANY, INC.

BY: _____
Peter W. H. Bordeaux
President

<u>APPENDIX I</u>

<u>RELEASE</u>

This Release (hereinafter referred to as "this Release") is entered into as of the 1st day of January 1992 between the undersigned TEQUILA HERRADURA, S.A. ("HERRADURA") and SAZERAC COMPANY, INC. (hereinafter referred to as "SAZERAC") and LORIS M. DIGRAZIA (hereinafter referred to as "DIGRAZIA").

WHEREAS, HERRADURA is a producer, bottler and exporter of tequila known under the names Herradura Gold, Herradura Silver and Herradura Anejo (hereinafter referred to as "the Brands"); and

WHEREAS, SAZERAC is an importer, seller, marketer and distributor of spirits products in the United States of America, which includes its territories and possessions, including Puerto Rico and the U.S. Virgin Islands, and the District of Columbia. (The United States of America, the above-described territories and, within the U.S. and such territories, airlines, ship chandlers, duty free shops, embassies and military installations, are hereinafter referred to as the "Territory"); and

WHEREAS, simultaneously with the execution of this Release, HERRADURA is entering into an agreement with SAZERAC (hereinafter referred to as the "Agreement") whereby HERRADURA appoints SAZERAC as the exclusive importer, seller, marketer and distributor of the Brands in the Territory, as of the effective date of the Agreement; and

WHEREAS, in consideration for the rights granted by HERRADURA to SAZERAC under the Agreement, SAZERAC shall make to DIGRAZIA, the U.S. representative of HERRADURA:

(a)  An initial payment upon the effective date of the Agreement; and

(b)  Subsequent, periodic payments based upon purchases of the Brands by SAZERAC;

Such payments are in addition to SAZERAC's obligations to HERRADURA under the Agreement; and

WHEREAS, HERRADURA agrees that the amounts of said payments need not be disclosed to HERRADURA by either SAZERAC or DIGRAZIA.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, receipt of which is hereby acknowledged, HERRADURA agrees as follows:

9267d:12532-00002·910923                    —24—

1.  HERRADURA hereby releases DIGRAZIA and SAZERAC and all
    of its subsidiaries, divisions, parents, affiliates,
    officers, directors, employees, successors and
    assigns, from any and all claims, demands, suits,
    actions, causes of action, liabilities, losses,
    damages, judgments, costs and expenses of any kind
    whatsoever, in law or equity, known or unknown, which
    HERRADURA ever had, hereafter can, shall or may have,
    arising out of or relating to the payments by SAZERAC
    to DIGRAZIA with respect to the Agreement.

2.  The parties hereto expressly waive the provisions of
    California Civil Code Section 1542, which provides as
    follows:

        A general release does not extend to claims which
        the creditor does not know or suspect to exist in
        his favor at the time of executing the release,
        which if known by him must have materially
        affected his settlement with the debtor.

3.  This Release shall be construed and interpreted in
    accordance with the laws of the State of California.

4.  This Release shall bind the undersigned and their
    successors and assigns.

5.  This Release may be altered, amended or modified only
    by a written instrument duly executed by HERRADURA,
    SAZERAC and DIGRAZIA.

IN WITNESS WHEREOF, the parties have caused this Release to be executed on the 21st day of October, 1991.

TEQUILA HERRADURA, S.A.

BY: _____
     Guillermo Romo de la Pena
     President


SAZERAC COMPANY, INC.

BY: _____
     Peter W. H. Bordeaux
     President


_____
LORIS M. DIGRAZIA

Sworn to before me
this 21st day of October, 1991


_____
Notary Public

SCHEDULE A

| Trademark | Reg. No. | Reg. Date | Goods |
|-----------|----------|-----------|-------|
| **United States** | | | |
| Herradura Natural Tequila Imported | 1,208,838 | September 14, 1982 | Tequila |

SCHEDULE B

HERRADURA'S INITIAL PRICES

|  | FOB – Amatitan<br>750 mls<br>9 Liter Cases |
|---|---|
| Herradura Silver | $ 71.00 |
| Herradura Gold | $ 98.00 |
| Herradura Anejo | $187.00 |

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Izerac Company, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Deborah Di Grazia

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia. Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

Superior Court of the State of California
County of Monterey
1200 Aguajito Road
Monterey, CA 93940

CASE NUMBER:
*(Número del Caso):*

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
ANDREW A. BASSAK (SBN 162440)          (415) 291-7400          (415) 291-7474

MANATT, PHELPS & PHILLIPS, LLP
One Embarcadero Center, 30th Floor
San Francisco, CA 94111

DATE:                                    Clerk, by _____, Deputy
*(Fecha)*                                *(Secretario)*                    *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☑ on behalf of *(specify):* Sazerac Company, Inc.
   under: ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc.
www.USCourtForms.com

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| ANDREW A. BASSAK (SBN 162440)<br>MANATT, PHELPS & PHILLIPS, LLP<br>One Embarcadero Center, 30th Floor<br>San Francisco, CA 94111<br>TELEPHONE NO: (415) 291-7400   FAX NO: (415) 291-7474<br>ATTORNEY FOR *(Name):* Plaintiff DEBORAH DI GRAZIA | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **Monterey**
STREET ADDRESS: 1200 Aguajito Road
MAILING ADDRESS:
CITY AND ZIP CODE: Monterey 93940
BRANCH NAME:

CASE NAME: Deborah Di Grazia v. Sazerac Company, Inc.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☒ **Unlimited** (Amount demanded exceeds $25,000)    ☐ **Limited** (Amount demanded is $25,000 or less) | ☐ Counter    ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☒ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties    d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve    e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence    f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. ☒ monetary   b. ☐ nonmonetary; declaratory or injunctive relief    c. ☐ punitive
4. Number of causes of action *(specify):* 5
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: February 19, 2008

Andrew A. Bassak
_____
(TYPE OR PRINT NAME)        ▶ _____
              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

1   MANATT, PHELPS & PHILLIPS, LLP
    ANDREW A. BASSAK (State Bar No. 162440)
2   ANN M. HEIMBERGER (State Bar No. 197060)
    ROSS K. NAUGHTON (State Bar No. 254926)
3   One Embarcadero Center, 30th Floor
    San Francisco, CA 94111
4   Telephone: (415) 291-7400
    Facsimile: (415) 291-7474
5
    Attorneys for Plaintiff
6   DEBORAH DI GRAZIA

7

**FILED**

FEB 2 0 2008

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
LISA DALIA        DEPUTY

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                         COUNTY OF MONTEREY

10                                              M 8 9 2 7 0

11  DEBORAH DI GRAZIA, a widow,          Case No.

12            Plaintiff,                 **COMPLAINT**

13       vs.                             1.  **Breach of Contract**

14  SAZERAC COMPANY, INC., a Louisiana   2.  **Breach of Implied Covenant of Good Faith**
    corporation; and DOES 1-20,
15                                       3.  **Unjust Enrichment**
            Defendants.
16                                       4.  **Breach of Implied Covenant**

17                                       5.  **Breach of Contract – Third Party
                                             Beneficiary**
18

19

20            Plaintiff DEBORAH DI GRAZIA hereby claims against defendants and alleges as

21  follows:

22                              **INTRODUCTION**

23            1.     This is a contract dispute involving payments due to the plaintiff, Deborah

24  di Grazia (hereinafter, "Plaintiff" or "Mrs. di Grazia"), from defendant, Sazerac Company, Inc.

25  (hereinafter, "Sazerac" or "Defendant"), pursuant to a written agreement between Mrs. di

26  Grazia's deceased husband, her predecessor in interest, and Sazerac.

27            2.     For over twenty-five years, Loris di Grazia ("Mr. di Grazia"), Plaintiff's

28  husband, was the exclusive United States representative of Tequila Herradura, S.A.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEY AT LAW
SAN FRANCISCO
                196601597.2

                                    COMPLAINT

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** (Name, State bar number, and address):

ANDREW A. BASSAK (SBN 162440)
MANATT, PHELPS & PHILLIPS, LLP
One Embarcadero Center, 30th Floor
San Francisco, CA 94111

TELEPHONE NO.: (415) 291-7400    FAX NO.: (415) 291-7474

ATTORNEY FOR (Name): Plaintiff DEBORAH DI GRAZIA

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Monterey
STREET ADDRESS: 1200 Aguajito Road
MAILING ADDRESS:
CITY AND ZIP CODE: Monterey 93940
BRANCH NAME:

CASE NAME: Deborah Di Grazia v. Sazerac Company, Inc.

*FOR COURT USE ONLY*

**FILED**

FEB 2 0 2008

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
LISA DALIA    DEPUTY

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: M89270 |
|---|---|---|
| ☒ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter   ☐ Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402). | JUDGE:   DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☒ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☒ monetary  b. ☐ nonmonetary; declaratory or injunctive relief  c. ☐ punitive
4. Number of causes of action (specify): 5
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: February 19, 2008

Andrew A. Bassak
(TYPE OR PRINT NAME)    ▶ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY | Reserved for Clerk's File Stamp |
|---|---|
| DI Grazia, Deborah,<br>    Plaintiff/Petitioner<br><br>vs.<br><br>Sazerac Company, Inc. et al,<br>    Defendant/Respondent | **FILED**<br><br>FEB 2 0 2008<br><br>CONNIE MAZZEI<br>CLERK OF THE SUPERIOR COURT<br>    LISA DALIA    DEPUTY |
| **CASE MANAGEMENT NOTICE** | Case No. M89270 |

**Case Management Conference Date: August 21, 2008 at 9:00 a.m.**

1.  NOTICE is hereby given that a CASE MANAGEMENT STATEMENT shall be filed with the Court and served on all parties NO LATER than; 30 days before the above date of the initial CASE MANAGEMENT CONFERENCE.

2.  No party may stipulate to extend any of the dates set above.

3.  At the CASE MANAGEMENT CONFERENCE, it is expected that trial counsel for each party and each self-represented party shall attend and be fully prepared to participate effectively in the conference.

4.  On receipt of the CASE MANAGEMENT STATEMENT and at or before the CASE MANAGEMENT CONFERENCE the Court may make the following orders:

    a.  refer the matter to arbitration, the court-directed mediation program, or other alternative dispute resolution procedures;
    b.  identify the case as one which may be protracted and in need of special attention;
    c.  assign the case to a particular judge for all purposes:
    d.  assign a mandatory settlement conference and trial date:
    e.  make orders establishing discovery schedules and cut-offs, including expert witness disclosure and discovery;
    f.  make appropriate Trial Management Orders; and/or
    g.  make any other orders to achieve the interests of justice and the timely disposition of the case, including the setting of additional Status Conferences.

5.  It is the policy of this Court that all complaints and cross-complaints be filed and served, all challenges to the pleadings be heard, and the matter be at-issue no later than 180 days from the filing of the complaint. It is the policy of this Court that all civil matters be resolved in no more than 12 to 24 months of the filing of the complaint.

6.  Failure to file the CASE MANAGEMENT STATEMENT, attend the CASE MANAGEMENT CONFERENCE and participate effectively, or comply with any CASE AND TRIAL MANAGEMENT RULES may result in sanction.

7.  It is the responsibility of the parties and/or their attorneys to be familiar with the Monterey County Case and Trial Management Policies and Rules and to comply therewith.

BY ORDER OF THE PRESIDING JUDGE

Date: February 20, 2008                         By: _____
                                               LISA DALIA
                                              Deputy Clerk

# Alternative Dispute Resolution
## OPTIONS FOR RESOLVING YOUR DISPUTE

**There Are Alternatives to Going to Trial**

Did you know that 95 percent of all civil cases filed in court are resolved without going to trial? Many people use processes other than trial to resolve their disputes. These alternative processes, known as Alternative Dispute Resolution or ADR, are typically less formal and adversarial than trial, and many use a problem-solving approach to help the parties reach agreement.

**Advantages of ADR**

Here are some potential advantages of using ADR:

- **Save Time:** A dispute often can be settled or decided much sooner with ADR; often in a matter of months, even weeks, while bringing a lawsuit to trial can take a year or more.
- **Save Money:** When cases are resolved earlier through ADR, the parties may save some of the money they would have spent on attorney fees, court costs, and expert's fees.
- **Increase Control over the Process and the Outcome:** In ADR, parties typically play a greater role in shaping both the process and its outcome. In most ADR processes, parties have more opportunity to tell their side of the story than they do at trial. Some ADR processes, such as mediation, allow the parties to fashion creative resolutions that are not available in a trial. Other ADR processes, such as arbitration, allow the parties to choose an expert in a particular field to decide the dispute.
- **Preserve Relationships:** ADR can be a less adversarial and hostile way to resolve a dispute. For example, an experienced mediator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.
- **Increase Satisfaction:** In a trial, there is typically a winner and a loser. The loser is not likely to be happy, and even the winner may not be completely satisfied with the outcome. ADR can help the parties find win-win solutions and achieve their real goals. This, along with all of ADR's other potential advantages, may increase the parties' overall satisfaction with both the dispute resolution process and the outcome.
- **Improve Attorney-Client Relationships:** Attorneys may also benefit from ADR by being seen as problem-solvers rather than combatants. Quick, cost-effective, and satisfying resolutions are likely to produce happier clients and thus generate repeat business from clients and referrals of their friends and associates.

Because of these potential advantages, it is worth considering using ADR early in a lawsuit or even before you file a lawsuit.

**What Are the ADR Options?**

The most commonly used ADR processes are mediation, arbitration, neutral evaluation, and settlement conferences.

**Mediation**

In mediation, an impartial person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties. The Monterey County Superior Court offers a Court-Directed Mediation Program.

**Cases for Which Mediation May Be Appropriate:** Mediation may be particularly useful when parties have a relationship they want to preserve. So when family members, neighbors, or business partners have a dispute, mediation may be the ADR process to use.

Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

**Cases for Which Mediation May Not Be Appropriate**: Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. There-fore, it may not be a good choice if the parties have a history of abuse or victimization.

## Arbitration

In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed.

Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Generally, there is no right to appeal an arbitrator's decision in binding arbitration. *Nonbinding arbitration* means that the parties are free to request a trial if they do not accept the arbitrator's decision. The Monterey County Superior Court offers a nonbinding judicial arbitration program.

**Cases for Which Arbitration May Be Appropriate**: Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

**Cases for Which Arbitration May Not Be Appropriate**: If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

## Neutral Evaluation

In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is often an expert in the subject matter of the dispute. Although the evaluator's opinion is nonbinding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

**Cases for Which Neutral Evaluation May Be Appropriate**: Neutral evaluation may be most appropriate in cases in which there are technical issues that require expertise to resolve or the only significant issue in the case is the amount of damages.

**Cases for Which Neutral Evaluation May Not Be Appropriate**: Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

## Settlement Conference

Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address): | |
|---|---|
| TELEPHONE NO.:              FAX NO. (Optional)<br>EMAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY<br>MAILING ADDRESS: 1200 Aguajito Road<br>CITY AND ZIP CODE: Monterey, CA 93940 | |
| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | |
| **Request to Vacate or Continue Initial<br>Case Management Conference and Order** | Case Number: |

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:            Time:        Dept.:            Div.:      Room:

---

> ► IF APPLICABLE, THIS REQUEST AND ORDER MUST BE FILED CONCURRENTLY WITH THE CASE MANAGEMENT STATEMENTS, WHICH ARE DUE NO LATER THAN 30 DAYS BEFORE THE INITIAL CASE MANAGEMENT CONFERENCE.
>
> ► PER LOCAL RULE 6.08(g), IF THE PARTIES DO NOT RECEIVE A SIGNED COPY OF THE ORDER GRANTING THE REQUEST, THEY MUST ATTEND THE CASE MANAGEMENT CONFERENCE.

---

Counsel and the parties certify that the initial Case Management Conference should be vacated or continued for the following reasons [circle one]:

1. All parties have appeared and agree to engage in the below ADR program [check one]:

   ☐ Court-Directed mediation         ☐ Private mediation              THE
   ☐ Nonbinding judicial arbitration  ☐ Private arbitration
   ☐ Other:

   __PARTIES AGREE TO COMPLETE THE ALTERNATIVE DISPUTE RESOLUTION PROGRAM WITHIN 90 DAYS OF THE FILING OF THIS FORM.__ Further Case Management Conference is requested

2. Case is concluded and judgment or dismissal has been entered as to all parties.

3. Case has settled; dismissal shall be filed on or before _____.

4. Case is at-issue and all parties agree that matter may be set for trial without the necessity of a Case Management Conference.

5. All defendants have not been served and the plaintiff has been granted an extension by the court until _____ to complete service on all defendants. Further Case Management Conference is requested.

6. A defendant has filed bankruptcy; case should be stayed pending the completion of bankruptcy. Plaintiff shall file a Supplemental Case Management Statement within ten (10) days of any action by the debtor or the Bankruptcy Court that would act as a lifting of said stay.

7. Case has been removed to Federal Court. Plaintiff shall file a Supplemental Case Management Statement within ten (10) days of any remand back to Superior Court or of any judgment or dismissal filed in the Federal Court.

| Request to Vacate or Continue Initial<br>Case Management Conference and Order | Case Number: |
|---|---|

8.  Plaintiff has obtained a default as to all defendants and will perfect the default by entry of court or clerk judgment in timely manner.  Further Case Management Conference is requested.

9.  All defendants have appeared and discovery is proceeding in a timely manner.  For reasons set forth in the parties' Case Management Statements, the case should be designated (circle one) Category I, Category II or Category III.    Parties anticipate case will be ready to set for trial as of _____.  Further Case Management Conference is requested.

10.  Other:

_____

_____

_____.  Further Case Management Conference is requested.

_____            _____
Counsel for Plaintiff (print name)                     Counsel for Defendant (print name)

_____            _____
Signature                                                          Signature

_____            _____
Counsel for Plaintiff (print name)                     Counsel for Defendant (print name)

_____            _____
Signature                                                          Signature

For additional parties, attach additional signature pages as needed.

---

Good Cause appearing, **IT IS SO ORDERED** that the Case Management Conference set for

_____ is vacated.

❑ Supplemental Case Management Statements shall be filed as set forth in 6 or 7 above.

❑ Receipt of Dismissal is set for _____.

❑ Further Case Management Conference is set for _____
Parties shall file Case Management Statements prior to said hearing per Local Rule 6.08(e).

**PLAINTIFF MUST SERVE A COPY OF THIS ORDER ON ALL PARTIES.**

Dated: _____            _____
                                                                *Judge of the Superior Court*

1

## PROOF OF SERVICE
## (FRCP 5)

2

3      I am a citizen of the United States and a resident of the State of California.  I am

4   employed in San Diego County, State of California, in the office of a member of the bar of this

5   Court, at whose direction the service was made.  I am over the age of eighteen years, and not a

6   party to the within action.   My business address is Cooley Godward Kronish LLP, 4401

7   Eastgate Mall, San Diego, California   92121.   On the date set forth below I served the

8   documents described below in the manner described below:

9

10      1.    Notice of Removal

11      ☒    (BY OVERNIGHT MAIL) I am personally and readily familiar with the business
              practice of Cooley Godward Kronish LLP for collection and processing of
12            correspondence for overnight delivery, and I caused such document(s) described
              herein to be deposited for delivery to a facility regularly maintained by Federal
13            Express for overnight delivery.

14

15   on the following part(ies) in this action:

16   Andrew A. Bassak
     Ann M. Heimberger
17   Ross K. Naughton
18   Manatt, Phelps & Phillips, LLP
     One Embarcadero Center, 30th Floor
19   San Francisco, CA 94111
     Telephone: (415) 291-7400
20   Facsimile: (415) 291-7474

21

22      Executed on March 21, 2008, at San Diego, California.

23

24                                              _____
                                                       Jacqueline J. Foglio
25

26

27

28